Filed 3/5/26

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| LAS POSAS VALLEY WATER RIGHTS COALITION, <br><br>    Plaintiff, Cross-defendant and Respondent; <br><br> v. <br><br> VENTURA COUNTY WATERWORKS DISTRICT NO. 1 et al., <br><br>    Defendants, Cross-complainants and Respondents; <br><br> CALLEGUAS MUNICIPAL WATER DISTRICT, <br><br>  Defendant and Cross-complainant; <br><br> MAHAN DEVELOPMENT CORPORATION et al., <br><br>    Defendants, Cross-defendants and Appellants; | 2d Civ. No. B330837 <br> (Super. Ct. No. VENCI00509700) <br> (Santa Barbara County) |

FOX CANYON
GROUNDWATER
MANAGEMENT AGENCY et
al.,

    Defendants, Cross-
defendants and Respondents.

The Las Posas Valley Water Rights Coalition, an unincorporated association comprised of landowners with claimed groundwater rights to the Las Posas Valley Groundwater Basin (Basin), initiated a comprehensive adjudication to determine all groundwater rights in the Basin. The adjudication proceeded in three phases.

In phase 1, the trial court set the Basin's initial "Total Safe Yield" and quantified the water rights for two public water suppliers. In phase 2, the court determined and allocated the remainder of individual groundwater rights based on a settlement agreement supported by a majority of the parties. In allocating water rights, the court gave priority to the overlying landowners with correlative rights and found there was no surplus for appropriators, who have second priority rights. In phase 3, the court adopted a "physical solution" and appointed Fox Canyon Groundwater Management Agency (Fox Canyon) as the Basin's watermaster to implement it. The final judgment includes the physical solution and is supported by nearly all the parties and the Basin's major public water agencies.

But not all parties are satisfied.  A group of landowners—Mahan Ranch, LLC and associated parties[1] (collectively Mahan Ranch)—and two mutual water companies—Del Norte Water Company (Del Norte) and Solano Verde Water Company (Solano Verde)—objected to aspects of phases 2 and 3 and the final judgment.  These appellants raise numerous contentions, including that the trial court allocated the water rights contrary to law and deprived the mutual water companies of their water rights.  We affirm the judgment.

FACTUAL AND PROCEDURAL HISTORY

The Basin underlies an area of approximately 42,200 acres located entirely within Ventura County.  It roughly extends from the eastern end of Saticoy through the city of Moorpark.  The Basin is bordered in the north by South Mountain and Oak Ridge, on the east by Big Mountain, on the south by the Springville Fault and Las Posas Hills, and on the west by the Oxnard subbasin.

The groundwater pumped from the Basin supports agricultural, commercial, and domestic uses.  Agriculture use accounts for the majority of groundwater use.  Some landowners use private wells.  Others are shareholders of mutual water companies.  A mutual water company is a corporation organized for or engaged in the business of selling, distributing, supplying,

---

[1] Ralph D. Mahan, Trustee of the Ralph D. Mahan Separate Property Trust of June 12, 2003; Ralph D. Mahan and Georgia A. Mahan, as Trustees of the Mahan Family Trust of June 12, 2003; Mahan Development Corporation; Oro Del Norte, LLC; RBV 2+5 LLC; RBV-Vanoni, LLC; US Horticulture Farmland, LLC; Debra A. Whitson, Thomas E. Olson, and Thomas K. Strain, Trustees of the McGonigle Ranch Trust dated April 1, 2021.

or delivering water to mutual shareholders.  (Corp. Code, § 14300.)  A landowner can exclusively receive water from mutual water companies (exclusive shareholders) or can receive water from both private wells and from mutual water companies (hybrid shareholders).  Some water users also receive water from three public agencies: Calleguas Municipal Water District (which imports water), and two county waterworks districts, Ventura County Waterworks District Nos. 1 and 19 (which supply groundwater and imported water).

In 1982, the Legislature created Fox Canyon.  Fox Canyon was tasked as the groundwater management agency (GMA) to plan, manage, control, preserve, and regulate the extraction and use of groundwater within the Basin.  Fox Canyon had previously set groundwater pumping allocations based on each user's historical allocations.  Over the years, Fox Canyon made efforts to reduce pumping in the Basin, including the adoption of Emergency Ordinance E in 2014.  This ordinance prohibited the issuance of permits for new groundwater wells and limited extractions from existing wells.

After this adjudication began, Fox Canyon adopted another allocation ordinance based on a proposed allocation schedule created by the Las Posas Users Group (LPUG) called the LPUG White Paper.  LPUG includes landowners, public agencies, and mutual water companies that came together to discuss and develop groundwater sustainability in the Basin.

The Department of Water Resources (the Department) recognizes the Basin as a single basin in a publication known as Bulletin 118, which defines groundwater basin boundaries.  Fox Canyon has recognized and created management areas based on the location of geologic structures.  Currently, Fox Canyon

4

manages the Basin by east and west management areas, divided by the location of the Somis Fault. The exact location of the fault has only been approximated in this litigation.

In 2014, the Legislature enacted the Sustainable Groundwater Management Act (SGMA) (Wat. Code, § 10720 et seq.) to provide for the sustainable management of groundwater basins. SGMA designated Fox Canyon as the Basin's groundwater sustainability agency (GSA). (Wat. Code, § 10723, subd. (c)(1)(D).) GSA's are responsible for regulating groundwater extractions, imposing fees, and enforcing SGMA requirements. (Wat. Code, §§ 10725.2, 10726.4, 10730, 10732.)

The Department designated the Basin as a "high-priority groundwater basin," meaning it was "subject to critical conditions of overdraft." (Wat. Code, § 10720.7, subd. (a)(1).) Overdraft occurs where the average annual amount of groundwater extraction exceeds the long-term average annual supply of water to the Basin. (Wat. Code, § 10735.) As required under SGMA, Fox Canyon submitted a groundwater sustainability plan (GSP), a planning document with the objective of achieving sustainable groundwater management in the Basin within 20 years. (Wat. Code, §§ 10727, 10727.2.) The Department approved the GSP in January 2022 with recommended corrective actions.

*Commencement of the litigation*

In March 2018, the plaintiffs filed a complaint alleging, among other things, that Fox Canyon's pumping restrictions were contrary to law and disregarded water rights priorities. The plaintiffs sought a comprehensive determination of the groundwater rights and priorities in the Basin. The trial court

5

ordered the adjudication to proceed in three phases. (Code Civ. Proc.,[2] § 840, subd. (b)(5).)

*Phase 1*

In phase 1, the trial court determined the initial estimated "Total Safe Yield" of the Basin and quantified the water rights for Ventura County Waterworks Districts Nos. 1 and 19 (collectively Waterworks Districts).

The parties entered into a phase 1 stipulation which set the initial "Total Safe Yield" to be approximately 36,000 acre-feet[3] of groundwater per year (AFY). The stipulated definition of "Total Safe Yield" is the "amount of inflow of water from" "native and non-native sources of water within the Basin. . . presently and in the future." The phase 1 stipulation allocated a total of 12.31 percent of the Total Safe Yield to the Waterworks Districts.[4] It provides that the "remainder of the Total Safe Yield (87.69%) will be allocated in future phases of the litigation among the Water Rights Holders other than the Districts." It also states that "[n]othing in this Stipulation will be deemed to resolve any issues

---

[2] Further unspecified statutory references are to the Code of Civil Procedure.

[3] An acre-foot of water covers one acre of land with one foot of water. It is equivalent to 43,560 cubic feet, or 325,851 gallons.

[4] This amount was apportioned between the East Las Posas subbasin and the West Las Posas subbasin. District 1 received 10.6 percent and District 19 received 1.9 percent from the east subbasin. District 19 also received 11.89 percent from the west subbasin.

6

or claims *inter se*[5] amongst the parties to the litigation other than the claims of the Districts *vis-à-vis* the other Water Rights Holders. All such parties reserve all possible claims *inter se*."

In September 2020, the trial court adopted the phase 1 stipulation as the "resolution of issues for this phase of trial" and entered the stipulation as the court's partial statement of decision.

*Phase 2*

In phase 2, the trial court determined the remainder of the water rights allocations among the groundwater users. Following a mediation facilitated by a neutral technical expert, approximately 87 percent of all parties who were groundwater extractors in the Basin agreed to a phase 2 settlement. The phase 2 settlement set forth a groundwater allocation schedule that quantified and assigned water allocations to all groundwater users. The allocation schedule was based on the Master Disclosure Record, created by the stipulating parties and included comprehensive information about historical water use, irrigated acreage, and land ownership. For the most part, the allocations are based on landownership and the amount of groundwater reasonably needed for use by an individual landowner.

The allocation schedule specified five different types of allocations—waterworks districts, agricultural, commercial, domestic, and mutual water company allocations. For agricultural allocations, the phase 2 settlement provides allocations in two forms—a base allocation based on historically irrigated acres and a supplemental allocation for certain higher

---

[5] "*Inter se*" means between or among themselves.

7

water users.  The phase 2 settlement provides the protocol and formulas to quantify each landowner's allocation in any given year.  The allocation calculations depend, in part, on the amount of the "operating yield" in effect.  The operating yield is how much water will be available in any particular year and may be adjusted annually depending on Basin conditions.

The trial court held a trial on phase 2, which lasted over one month.  Mahan Ranch was the only party to present an alternative allocation plan.  The court found that Mahan Ranch's proposed plan was essentially based "purely on historic use."  The court rejected this plan because it found that reliance "solely on historic use to develop allocations in this Basin would produce inequities, as attested to . . . by various witnesses in this case."

The trial court adopted the phase 2 settlement's approach with respect to landowners with "unexercised overlying rights" or "dormant" claims.  It found it would be appropriate "to subordinate, *but not eliminate,* the rights of overlying groundwater users with only speculative demand for groundwater."  (Italics added.)  Granting dormant allocations would impose "undue hardship on current users" and "disrupt existing, long-standing investments in favor of speculative future uses."  Specifically, as to Solano Verde, the court found it had not used Basin groundwater since 2005, demonstrated no intent to resume groundwater use, and took steps to rely exclusively on imported water.  The court concluded it would be "unfair to allocate groundwater to Solano Verde, which has no present or anticipated need for or reliance on groundwater."

The trial court found the phase 2 settlement offered "an equitable solution" that reflected the overlying landowners' current, reasonable, and beneficial need for water.  The court

8

found there was no surplus water available for appropriators, whose rights are junior in priority to overlying landowners. The court found the evidence, including the Master Disclosure Record, supported the phase 2 settlement. It further found that the settlement was consistent with the California Constitution, consistent with water right priorities, and treated the nonsettling parties equitably. The court adopted the phase 2 settlement in the phase 2 statement of decision.

*Phase 3*

In phase 3, the trial court adopted a physical solution. A physical solution is "an agreed-upon or judicially imposed resolution of conflicting claims in a manner that advances the constitutional rule of reasonable and beneficial use of the state's water supply." (*City of Santa Maria v. Adam* (2012) 211 Cal.App.4th 266, 287 (*Santa Maria*).) It is " 'an equitable remedy designed to alleviate overdrafts and the consequential depletion of water resources in a particular area, consistent with the constitutional mandate to prevent waste and unreasonable water use and to maximize the beneficial use of this state's limited resource.' " (*Ibid*.)

Several parties negotiated a phase 3 settlement, which was disclosed to the trial court and all parties. Over 80 percent of all parties who are groundwater extractors (including those responsible for more than 80 percent of the groundwater extracted from 2013 to 2017) and the Basin's public works agencies—Calleguas, the Waterworks Districts, and Fox Canyon—supported the phase 3 settlement. The settling parties stipulated to a proposed judgment disclosed to the court and all parties. The stipulated judgment incorporates the phase 1 order, phase 2 statement of decision, and the phase 3 settlement, and

"integrates them into a complete document that will serve as a 'constitution' for the Basin moving forward." Mahan Ranch, Del Norte, and Solano objected to the phase 3 settlement and proposed judgment. No objecting party proposed an alternate comprehensive plan for Basin management.

After a trial on phase 3, the trial court adopted the phase 3 settlement and stipulated judgment. The court found the phase 3 settlement "fully resolves the Phase 3 issues," and with the stipulated judgment, "offer a comprehensive, reasonable, and equitable physical solution that complies with the California Constitution and SGMA." The court concluded the settlement and stipulated judgment are "appropriate for resolution of the adjudication under . . . section 849."

The judgment appoints Fox Canyon as watermaster (Stats. 1982, ch. 1023, p. 3734, §1, West's Ann. Wat.—Appen. (1995 ed.) ch. 121, §§ 121-102, 121-201) to "assist the Court in the administration of this Judgment" as GSA and as the "special act water agency created to manage and conserve Basin groundwater resources." It also set forth the watermaster's powers and responsibilities in managing the Basin. The judgment incorporates the phase 1 and phase 2 rulings, including the allocation schedule and the method of calculating each water rights holder's annual allocation based on a given year's water supply. The judgment also includes provisions relating to Basin management, stakeholder participation in managing the Basin, Basin assessments and funding, and other various provisions. The judgment allows the trial court to "retain full jurisdiction, power, and authority to oversee and address matters relating to [its] implementation" pursuant to section 852.

10

DISCUSSION

*Water rights*

"Courts typically classify water rights in an underground basin as overlying, appropriative, or prescriptive. [Citation.] An overlying right, 'analogous to that of the riparian owner in a surface stream, is the owner's right to take water from the ground underneath for use on [their] land within the basin or watershed; it is based on the ownership of the land and is appurtenant thereto.' [Citation.] One with overlying rights has rights superior to that of other persons who lack legal priority, but is nonetheless restricted to a reasonable beneficial use. Thus, after first considering this priority, courts may limit it to present and prospective reasonable beneficial uses, consonant with article X, section 2 of the California Constitution." (*City of Barstow v. Mojave Water Agency* (2000) 23 Cal.4th 1224, 1240, fn. omitted (*Mojave*).) "The priority pumping right among overliers is a correlative interest: it is shared along with all of the other overlying landowners." (*Antelope Valley Groundwater Cases* (2021) 62 Cal.App.5th 992, 1023 (*Antelope II*).) A court "may employ equitable apportionment principles when allocating available water among claimants holding correlative rights." (*Id.* at pp. 1051–1052.)

An appropriative right to water is the right "to take and use surplus water for uses outside the overlying land." (*Antelope II*, *supra*, 62 Cal.App.5th at p. 1023.) The right of an appropriator depends on the actual taking of water. (*Mojave*, *supra*, 23 Cal.4th at p. 1241.) " 'Proper overlying use, however, is paramount, and the right of an appropriator, being limited to the

11

amount of the surplus, must yield to that of the overlying owner in the event of a shortage.' " (*Id.* at p. 1245.)[6]

All water rights in California are subject to article X, section 2 of the California Constitution (article X, section 2), which limits water rights to reasonable and beneficial uses. (Cal. Const., art. X, § 2; *Mojave, supra*, 23 Cal.4th at p. 1241.) It provides that "the water resources of the State be put to beneficial use to the fullest extent of which they are capable, and that the waste or unreasonable use or unreasonable method of use of water be prevented, and that the conservation of such waters is to be exercised with a view to the reasonable and beneficial use thereof in the interest of the people and for the public welfare." (Cal. Const., art. X, § 2.) "This overarching consideration applies to all water users, regardless of the source from which their rights are grounded [citation], because no party has a protectable interest in the unreasonable use of water." (*Antelope II, supra*, 62 Cal.App.5th at pp. 1024–1025.) Article X, section 2 means that paramount priority water rights holders "may not be so profligate with their uses of available water that they deprive others of water that would otherwise be 'surplus' and hence available for appropriation." (*Antelope II*, at p. 1025.)

*Comprehensive adjudications of groundwater rights*

In 2015, the Legislature enacted Assembly Bill No. 1390 (2015–2016 Reg. Sess.) (Stats. 2015, ch. 672, § 1), which added to the Code of Civil Procedure the method and procedure for comprehensive groundwater adjudications. (§ 830 et seq.) Under these statutes, the superior court "may determine all groundwater rights of a basin, whether based on appropriation,

_____

[6] We do not discuss prescriptive rights to water because there is no issue regarding those rights in this appeal.

overlying right, or other basis of right." The court's final judgment may declare the priority, amount, and purpose of use for the groundwater rights of each party to the adjudication "subject to terms adopted by the court to implement a physical solution." (§ 834.) Adjudications shall be consistent with article X, section 2 and the goals of SGMA. The statutes "[e]ncourag[e] the compromise and settlement of comprehensive adjudications." (§ 830, subd. (b)(1), (3) & (4).)

In a groundwater adjudication, the superior court has the authority and duty to impose a physical solution on the parties where necessary. (§ 849, subd. (a).) "Physical solutions are employed 'to alleviate overdrafts and the consequential depletion of water resources in a particular area' [citation], and require the court to apply 'general equitable principles to achieve practical allocation of water to competing interests so that a reasonable accommodation of demands upon a water source can be achieved.'" (*Antelope II, supra*, 62 Cal.App.5th at p. 1025.) A court cannot, however, change the priorities among water rights holders nor eliminate vested rights in applying the solution without first considering them in relation to the reasonable use doctrine. (*Mojave, supra*, 23 Cal.4th at p. 1250.) Although a court may use physical solutions to alleviate an overdraft, an overdraft is not required before the court may impose a physical solution. (*Santa Maria, supra*, 211 Cal.App.4th at p. 288.)

Section 850, subdivision (a) provides that the court may enter a judgment in a comprehensive adjudication if it finds that the judgment is (1) consistent with article X, section 2, (2) consistent with the water right priorities of all nonstipulating parties, (3) treats all objecting parties equitably as compared to

13

the stipulating parties, and (4) considers the use and accessibility of water for small farmers and disadvantaged communities.

If a "party or group of parties submits a proposed stipulated judgment that is supported by more than 50 percent of all parties who are groundwater extractors in the basin or use the basin for groundwater storage and is supported by groundwater extractors responsible for at least 75 percent of the groundwater extracted in the basin during the five calendar years before the filing of the complaint, the court may adopt the proposed stipulated judgment, as applied to the stipulating parties, if the proposed stipulated judgment meets the criteria described in subdivision (a). *A party objecting to a proposed stipulated judgment shall demonstrate, by a preponderance of evidence, that the proposed stipulated judgment does not satisfy one or more criteria described in subdivision (a) or that it substantially violates the water rights of the objecting party.* If the objecting party is unable to make this showing, the court may impose the proposed stipulated judgment on the objecting party." (§ 850, subd. (d), italics added.)

For this Basin, the superior court must also find that the judgment in a water rights adjudication action will not substantially impair the ability of the GSA, the State Water Resources Control Board, or the Department to comply with SGMA and to achieve sustainable groundwater management. (Wat. Code, § 10737.8.)

*Contentions on appeal*

Mahan Ranch, Del Norte, and Solano Verde each filed separate appeals and briefs that raise numerous contentions. We summarize these contentions as follows: Mahan Ranch and Del Norte contend that the judgment deprives the mutual water

14

companies of water rights and interferes with the companies' corporate governance, the trial court did not properly analyze the appropriative rights of mutual water companies, and the judgment's provisions regarding Basin assessments violate Proposition 218 and the California Constitution.

Mahan Ranch also contends the judgment is inconsistent with phase 1 and is illegal for various reasons, the court erred in making certain evidentiary findings, and the physical solution is unnecessary. Mahan Ranch further requests that it and Del Norte be exempted from the physical solution.

Del Norte also contends the trial court did not determine water rights, the judgment impermissibly transfers water outside the Basin boundaries, and the judgment does not comply with the California Environmental Quality Act (CEQA) (Pub. Resources Code § 21000 et seq.).

Solano Verde contends the trial court erred in "extinguish[ing]" its water rights as an overlying landowner and disregarding its rights to return flows from water it imported.

All three parties contend the judgment does not treat the nonstipulating parties equitably.

We group our discussion of these contentions into three categories: (1) water rights and priorities, (2) the physical solution and judgment, and (3) other arguments.

*Standard of review*

"The most fundamental rule of appellate review is that a judgment is presumed correct, all intendments and presumptions are indulged in its favor, and ambiguities are resolved in favor of affirmance. [Citations.]" Where appellants challenge the sufficiency of evidence, our review is limited to whether there is substantial evidence contradicted or uncontradicted that will

15

support the challenged factual finding.  (*Santa Maria, supra*, 211 Cal.App.4th at p. 286.)  When the decisive facts are undisputed, questions of law are reviewed de novo.  (*Ibid*.)

In groundwater adjudications, a trial court's determination of water allocation among claimants with equal priority and implementation of a physical solution are exercises of the court's equitable powers.  We review these exercises of equitable powers for an abuse of discretion.  (*Mojave, supra*, 23 Cal.4th at pp. 1249–1252.)  "The court's discretion as to equitable remedies, while not unlimited, should be granted deference when the record reflects the trial court has considered 'the material facts affecting the equities between the parties.' "  (*Antelope II, supra*, 62 Cal.App.5th at pp. 1026–1027.)

*Water rights and priorities*

*1.  Allocations to landowners based on their overlying rights*

Mahan Ranch and Del Norte contend the trial court erred in allocating water directly to the shareholders/landowners rather than to the water companies.  They contend the water companies own the legal title to water rights.  We conclude there was no error.[7]

Generally, there are two types of mutual water companies. (*Orange County Water District v. City of Riverside* (1959) 173 Cal.App.2d 137, 194 (*Riverside*).)  In the first type, "landowners

---

[7] Respondent Las Posas Farming Group contends Mahan Ranch lacks standing to assert the mutual water companies' rights.  Because Del Norte raises this issue and we resolve it on the merits, we do not reach the issue of standing.  Thus, we deny Mahan Ranch's March 27, 2025, request for judicial notice because the exhibits are not relevant or necessary to resolving this appeal.  (*San Diego City Firefighters, Local 145 v. Board of Administration etc.* (2012) 206 Cal.App.4th 594, 600, fn. 3.)

16

with . . . overlying rights join together and form a company to effect economy and promote convenience by use of joint production and distribution facilities. . . . The company is merely the agent of the . . . overlying landowner whose rights are being exercised on their behalf." (*Ibid.*; see e.g., *In re Estate of Thomas* (1905) 147 Cal. 236, 242 [landowners retained their riparian rights while water company exercised those rights on their behalf]; *Locke v. Yorba Irrigation Co.* (1950) 35 Cal.2d 205, 209 (*Locke*) [transfer of water right from landowner to mutual water company in exchange for stock representing the "quantum of the right, was nothing more than a change in the formal evidence of title" and not "change in the form of the ownership of the right," which remained with the landowner].)

The second type of mutual water company owns its water rights and is not merely an agent of its shareholders, even though their stock may be appurtenant to, or attached to, the shareholders' respective land. (See *Erwin v. Gage Canal Co.* (1964) 226 Cal.App.2d 189, 192–193 (*Erwin*) [comparing the difference between a transfer of title to water to a mutual water company in exchange for the right to receive water from the company, on the one hand, and entrustment of that property right to the water company to hold as trustee for owner, who holds stock; the former transfers title to the water but the latter does not].) In such instances, the company owns the water before it is delivered to its shareholders. (See e.g., *Consolidated Peoples Ditch Co. v. Foothill Ditch Co.* (1928) 205 Cal. 54, 63–64 [shareholders only had a right to a proportionate share of water that was owned and appropriated by the mutual water company].)

Although a landowner may sever their overlying right to groundwater from the land and transfer that right to a mutual water company, the company does not gain an equal-priority overlying right in the same form. Instead, the company can only estop the grantor landowner from challenging the water company's use of water, but such use is still subject to challenge by other overlying landowners. (See *Orange County Water District v. City of Colton* (1964) 226 Cal.App.2d 642, 647–648.) Generally, to the extent mutual water companies own water rights, they are appropriators. (*Riverside*, *supra*, 173 Cal.App.2d at p. 194; *City of Pasadena v. City of Alhambra* (1949) 33 Cal.2d 908, 925 (*Pasadena*) [appropriation is "any taking of water for other than riparian or overlying uses"].)

Whether a mutual water company is acting as an agent/trustee or is the legal owner of water rights is a factual question. (*Erwin*, *supra*, 226 Cal.App.2d at p. 193.) In making this determination, a trial court can consider multiple factors, including course of conduct and the relationship between the mutual water company and its shareholders over the years. (*Ibid*.)

Here, after considering the history of the water companies and their governing documents, the trial court found it was "undisputed that . . . shareholders in the Basin own overlying rights independent of the mutual water companies" and that these "rights are superior." The mutual water companies "do not dictate or control the overlying landowners' water rights; rather, the companies control the use of the shared facilities to deliver water." "On the law and the facts here, the landowners retain their overlying rights." Each mutual water company "acts as an agent for each of its [shareholders]."

18

Substantial evidence supports the trial court's ruling.  The landowners never severed their overlying rights or transferred their rights to the water companies by a written covenant.  (See Civ. Code, § 1624, subd. (a)(3) [an agreement for sale of real property or of an interest therein is invalid unless in writing].)  Several overlying landowners testified that they have not transferred or assigned their water rights to the mutual water companies.  Nor did the water companies represent to their shareholders that they owned the water delivered to the shareholders.

Several mutual water companies recognized that the shareholders owned the legal water rights.  For instance, Berylwood Heights Mutual Water Company (Berylwood)'s annual shareholder meeting minutes recognized that "[m]utuals can have water rights in two ways: 1) trustee/ agent . . . exercises an overlying right on behalf of shareholders and shareholders own the legal right, and 2) shareholders have deeded/transferred over their water rights to the company.  *Presently, Berylwood is acting as the trustee to its shareholders.*"  (Italics added.)  The mutual water companies' corporate documents do not prove the contrary.  (See *post*, at pp. 22–25.)  These documents do not show the landowners forfeited or severed their ownership of overlying water rights to the water companies.  (See *Locke, supra,* 35 Cal.2d at p. 209 [stock representing the "quantum of the right" did not change ownership of the water right]; see also *Copeland v. Fairview Land & Water Co.* (1913) 165 Cal. 148, 161–162 [stock certificates stating that shareholders were entitled to a part of water " 'belonging to' " the water company "did not change the nature of the right, nor divest the beneficial interest therein from" the owner of the land, who retained the riparian right].)

19

Furthermore, the mutual water companies' course of conduct does not reflect ownership of water rights. They have not "asserted exclusive rights against their shareholders" because they have not restricted shareholders from extracting their own groundwater or drilling private wells. The companies did not historically limit deliveries according to share ownership, which gave "landowners no reason to believe that their water rights would be so limited in the future." Such evidence supports the trial court's finding that the landowners retained ownership of their overlying water rights.

Substantial evidence also supports the trial court's finding that allocating water directly to the mutual water companies would lead to inequitable results. The court relied on the testimony of Robert Grether, one of the overlying landowners and individuals responsible for compiling the Master Disclosure Record. He testified and provided data to show there were numerous shareholders whose stock ownership in mutual water companies was not proportional to their historic use and that allocations directly to the water companies would create massive windfalls for some landowners while devastating others. Grether also illustrated ways in which parties could potentially "double-dip" and receive water both from their own historical allocation (by way of private wells) and from water allocated to mutual water companies. "The testimony of a single witness, unless it is impossible or inherently improbable, will be sufficient to support the challenged findings." (*Antelope Valley Groundwater Cases* (2020) 59 Cal.App.5th 241, 260 (*Antelope I*).) Nor can we reweigh evidence or redetermine the credibility of witnesses. (*Orange Catholic Foundation v. Arvizu* (2018) 28 Cal.App.5th 283, 294 (*Arvizu*).) The trial court found Grether's

testimony credible, and it is sufficient to support the trial court's finding.

Mahan Ranch also contends that overlying landowners who exclusively obtain water through mutual water companies possess dormant rights that are subordinate to the companies actively pumping groundwater because the landowners themselves do not pump groundwater. We are not persuaded. As the trial court found, such "shareholders generally are overlying landowners *actively irrigating their land with Basin groundwater. . . .* Those landowners' interests are not in the nature of long-unexercised rights that would disrupt existing reasonable and beneficial uses of water." (See *In re Waters of Long Valley Creek Stream System* (1979) 25 Cal.3d 339, 358–359 (*Long Valley*); § 830, subd. (b)(7) [the trial court has discretion to determine that an unexercised overlying claim has subordinate priority if it "conflict[s] with the public interest in reasonable and beneficial use of state waters"]; Cal. Const., art. X, § 2.)

Subordinating a landowner's priority because they rely solely on water companies to pump groundwater would lead to unfair and irrational results. Because the majority of landowners in the Basin are "exclusive" shareholders in water companies, these landowners would be treated disparately from their neighboring landowners who have private wells. And as we concluded, the landowners did not forfeit their overlying rights to the mutual water companies. We conclude the trial court properly found that the landowners "retain[ed] their overlying rights, and those rights must receive priority."

The trial court's allocation directly to landowners comports with governing law on water rights. An overlying right is the right of the landowner "to take water from the ground

21

underneath for use on [their] land within the basin . . . ; the right is based on ownership of the land and is appurtenant thereto." (*Pasadena, supra,* 33 Cal.2d at p. 925.) This right is paramount and receives priority over appropriative rights. (*Id.* at p. 926.) The court properly recognized these senior water rights; there was no error in allocating water directly to the overlying landowners.

### 2. *Mutual water companies' articles and bylaws*

Mahan Ranch and Del Norte contend that granting water allocations directly to shareholders conflicts with the mutual water companies' articles and bylaws. They assert these governing documents establish that shareholders only have a vested right to receive a "proportionate share of a mutual's common pool of water." But as the trial court found, the flaw in this argument is that it "conflate[s] the physical *delivery* of water . . . with a water rights assignment." (Italics added.)

We independently reviewed the water companies' articles and bylaws (*Morgan v. City of Los Angeles Bd. of Pension Comrs.* (2000) 85 Cal.App.4th 836, 843) and conclude that nothing in these documents vests the companies with ownership or control over the water rights belonging to the overlying landowners. As these governing documents highlight, the mutual water companies were "organized for the purpose solely of *delivering* water to its stockholders at cost." (Italics added.) The governing documents set forth the terms in which water is delivered to their shareholders. These terms can limit the amount of water delivered to their shareholders. But the articles and bylaws do not and cannot dictate water rights that the water companies do not own.

22

In highlighting the distinction between water delivery and water ownership, the trial court explained that the judgment allocates water to the landowner based on the amount of water reasonably needed for use on their land. That amount is allocated irrespective of whether the water is pumped from a private well or received from a mutual water company, or a combination of both sources. The judgment allows mutual water companies to "manage the allocations granted to their exclusive shareholders" and "all shareholders retain the value of their shared entitlement to use the mutual [water companies'] facilities to obtain groundwater." The judgment "preserves the landowner's existing right to determine that, at some point in the future, [they] would rather rely on a different well . . . without being cut off from the historical water supply in which the landowner holds an overlying right."

And, as the trial court observed, the judgment "does not require the mutual water companies to change their rules governing utilization of the companies' infrastructure in times of frost, fire, or some other short-term shortage that impacts the physical supply of water." Historically, when water supply is sufficient, Del Norte and other mutual water companies have not limited water deliveries according to share ownership. Some shareholders take more than their proportionate share and some take less. But in times of shortage, the governing documents allow a mutual water company to limit water service in accordance with the shareholders' proportionate shares. Nothing in the judgment changes this approach.

Mahan Ranch and Del Norte cite to *De Boni Corp. v. Del Norte Water Co.* (2011) 200 Cal.App.4th 1163, but that case is inapposite. In *De Boni*, a shareholder sued Del Norte, arguing

that Del Norte's articles and bylaws governing its own water distribution system among its shareholders violated corporate law. (*Id*. at p. 1165.) Significantly, *De Boni* was about a shareholder's contractual right to water service. (*Id*. at p. 1170.) It was not a groundwater adjudication determining the water rights and allocations for an entire basin. (*Id*. at pp. 1169–1171.) *De Boni* did not analyze whether Del Norte acquired any water rights or whether it was the shareholders who retained the overlying water rights. (*Ibid*.)

Del Norte contends there are other ways in which the judgment interferes with the water companies' corporate governance. It contends the judgment allows shareholders to transfer their water allocations outside of Del Norte's service area, which conflicts with its articles and bylaws. This contention lacks merit and conflates a landowner/shareholder's water rights with their rights for water service and delivery from a water company.

The judgment allows a water right holder to transfer their allocation with the approval of the watermaster and with some restrictions (e.g., restrictions against transfers outside the Basin). The judgment's transfer provision does not conflict with any of Del Norte's rules that prohibit water delivery or stock transfers outside of Del Norte's service area. Nor does the judgment authorize a shareholder to transfer its right to receive water from Del Norte outside of Del Norte's service area or obligate Del Norte to deliver water outside its service area. A landowner's transfer of a water right is distinct from the transfer of the right to water service from a water company.

Del Norte also contends the judgment "changes [its] corporate structure" by creating two new classes of shares—

24

mutual exclusive and mutual hybrid shares. This misapprehends the judgment. There is no dispute Del Norte issues one class of shares, and the judgment does not change that. The judgment's reference to exclusive shareholders and mutual shareholders only reflects that some shareholders rely exclusively on mutual water companies to obtain their water allocations versus other shareholders that rely on both mutual water companies and private wells for their allocations. Nothing about the judgment, nor its distinction between exclusive and hybrid shareholders, changes Del Norte's corporate structure.

### 3. *Appropriative rights of mutual water companies*

Del Norte and Mahan Ranch contend that mutual water companies were entitled to appropriative water rights. Del Norte further asserts the trial court did not find there was an overdraft, and without such a finding, their "appropriative rights cannot be rejected." We are not persuaded.

An appropriator is entitled to water when there is excess or surplus water available in the basin. (*Mojave, supra*, 23 Cal.4th at p. 1241.) The party asserting an appropriative right has the burden of proving the existence of a surplus from which it can "extract the quantity it desires from . . . subterranean flow without injury to the uses and requirements of those who have prior rights." (*Tulare Irrigation Dist. v. Lindsay-Strathmore Irrigation Dist.* (1935) 3 Cal.2d 489, 535 (*Tulare*); see also *Antelope I, supra*, 59 Cal.App.5th at p. 277.)

Here, the trial court ruled that it could not grant Del Norte or any mutual water company allocations as an appropriator because it found there was no surplus available. The court articulated that it "is the appropriator's 'burden . . . to show surplus,' . . . as the Court's judgment in this case must 'preserve

25

water right priorities . . . . In the case of an overdraft [(i.e., an absence of surplus)], . . . overlying use is paramount, and the rights of the appropriator must yield to the rights of the . . . overlying owner.'" The court ruled it "must allocate the landowner/shareholders, as senior priority right holders, groundwater based on correlative rights. Any water historically pumped by the mutual water companies *went to service that same demand.*" The court could not grant separate allocations to both the mutual water company and individual landowners based on the same use.

Substantial evidence supports the court's finding there was no surplus water for appropriation. The evidence, including historical pumping data and the report of expert Anthony Brown, shows that the historical groundwater production and current demand in the Basin exceeded the Basin's Total Safe Yield of 36,000 AFY estimated in phase 1 and the higher operating yield of 40,000 AFY. Brown concluded there was no surplus available for appropriation.

As the trial court acknowledged, if there was any more water available, there were overlying landowners who would pursue additional claims of water. The court also found Del Norte's expert, who testified there was a surplus, to be unpersuasive and rebutted by Brown. We do not reweigh the trial court's assessment of facts or credibility of witnesses. (*Arvizu*, *supra*, 28 Cal.App.5th at p. 294.) Furthermore, Del Norte did not quantify the amount of surplus that it could extract without injury to the uses of those with priority rights. (*Tulare*, *supra*, 3 Cal.2d at p. 535.) Nor did Del Norte show whether the surplus water allocation it sought would service the same demand from its shareholders based on their overlying rights. In

short, the mutual water companies did not carry their burden to show they were entitled to appropriative water rights.

### 4. Solano Verde water rights

#### a. Dormant rights

Solano Verde contends the trial court erred in finding it was a dormant water rights holder and "extinguish[ing] its overlying rights." We disagree.

A "court may employ equitable apportionment principles when allocating available water among claimants holding correlative rights [citation], and . . . restrictions on future unexercised correlatively held rights are within the range of options available." (*Antelope II*, *supra*, 62 Cal.App.5th at pp. 1051–1052; *Long Valley*, *supra*, 25 Cal.3d at pp. 358–359.) Such restrictions include subordinating the priority of an unexercised (or dormant) right of an overlying landowner. (§ 830, subd. (b)(7).) Subordination, however, does not eliminate dormant overlying rights, but allows the court to quantify presently exercised pumping rights without risk of interference by the speculative needs of a claimant with dormant rights. (*Long Valley*, at p. 359; *Antelope II*, at p. 1052.)

Here, the trial court subordinated Solano Verde's overlying rights after finding it "ha[d] not used Basin groundwater since 2005 and ha[d] demonstrated no intent to resume groundwater use." The court did not "extinguish" Solano Verde's rights. As it explained, Solano Verde, and any other dormant party, is allowed to "access groundwater in a convenient manner, but only after demonstrating that their new use will not unduly impact the Basin and will be offset with new water supplies."

Substantial evidence supports the finding that Solano Verde had dormant rights. Solano Verde had not used Basin

27

groundwater since its two wells failed around 2005. The evidence, including testimony from Solano Verde's water systems operator, established that it had no plans to replace these wells or pump groundwater. After its wells failed, Solano Verde sold or attempted to sell its historical pumping allocation. It also secured water through other sources, such as purchasing and receiving imported water from Calleguas.

Based on this evidence, the trial court did not abuse its discretion in subordinating Solano Verde's rights. All water rights are limited to "reasonable and beneficial uses." (Cal. Const., art. X, § 2.) Where water is insufficient, each overlying landowner has a common right to take a proportionate fair share "predicated not on his past use over a specified period of time, nor on the time he commenced pumping, but solely on his current reasonable and beneficial need for water." (*Tehachapi-Cummings County Water Dist. v. Armstrong* (1975) 49 Cal.App.3d 992, 1000.) Under the circumstances here, it would have been unreasonable to allocate water to Solano Verde, who had not used the Basin's groundwater for over 20 years and did not establish a current need for it. (*Antelope II*, *supra*, 62 Cal.App.5th at p. 1024.)

Solano Verde also contends the trial court "improperly relied upon Water Code section 1005.1" to extinguish overlying rights. In our view, Solano Verde mischaracterizes the court's actions. Water Code section 1005.1 allows a landowner, who ceases groundwater extraction in favor of using an alternative supply of water (i.e., imported water), to preserve its groundwater right by filing an annual statement with the Board. "[O]n or before December 31st of each calendar year, [a landowner must file] a statement of the amount of water from

28

such source so applied to reasonable beneficial use." The landowner "cannot claim the benefit of this section for any water year for which such statement is not filed."

At trial, Solano Verde attempted to argue that it preserved its groundwater right by filing a statement under Water Code section 1005.1. The trial court rejected this argument because the statement was untimely (filed approximately 15 years too late). The trial court did not, as Solano Verde suggests, rely on Water Code section 1005.1 to extinguish or subordinate Solano Verde's water rights.

### b. *Return flows*

Solano Verde also contends it was entitled to a water rights allocation based on imported "return flow[s]"—water that is imported and percolates into the Basin. (*City of Los Angeles v. City of San Fernando* (1975) 14 Cal.3d 199, 260 (*San Fernando*), disapproved on other grounds by *Mojave*, *supra*, 23 Cal.4th at pp. 1244–1248.) "Even though all deliveries produce a return flow, only deliveries derived from imported water add to the ground supply. The purpose of giving the right to recapture returns from delivered imported water . . . is to credit the *importer* with the fruits of his expenditures and endeavors *in bringing into the basin water that would not otherwise be there*." (*Id.* at p. 261, italics added.)

After phase 1, all remaining groundwater allocation claims were resolved in phase 2. But Solano Verde did not seek a "return flows" allocation during phase 2. Because issues adjudicated in earlier phases of a bifurcated trial are binding on later phases (*Arntz Contracting Co. v. St. Paul Fire & Marine Ins. Co.* (1996) 47 Cal.App.4th 464, 487), the trial court properly rejected Solano Verde's untimely claim of return flows.

29

Solano Verde's claim also fails on the merits. It is undisputed Solano Verde did not import any water into the Basin—Calleguas did. As the trial court found, Solano Verde was "a mere middle-man" that purchased water from Calleguas. Thus, Solano Verde did not show its own "expenditures and endeavors" brought any water into the Basin. (*San Fernando*, *supra*, 14 Cal. 3d at p. 261.) The court also found the evidence insufficient to prove that the purported return flows actually recharged the Basin or that Solano Verde had any intent or ability to use those return flows because it had no functioning well. (See *Orange County Water Dist. v. Sabic Innovative Plastics US, LLC* (2017) 14 Cal.App.5th 343, 411 [one is entitled to imported return flows "only where the water importer intends to reappropriate the imported water: 'Such water is not abandoned *where there is an intent to recapture it*' " (italics added)].) We will not disturb the court's evidentiary finding. (*Arvizu, supra*, 28 Cal.App.5th at p. 294.)

### 5. *Consistency with water right priorities*

Del Norte contends the trial court violated section 850, subdivision (a) by not determining the water rights of the parties before entering judgment. We reject this contention.

Section 850, subdivision (a) permits the court to enter judgment in a comprehensive adjudication if the judgment meets certain criteria, including that it "is consistent with the water right priorities of all nonstipulating parties and any persons who have claims that are exempted pursuant to Section 833 in the basin." (§ 850, subd. (a)(2).) Here, the court allocated water "based on the Landowners' Overlying Rights" and their reasonable and beneficial need. In this adjudication, "[t]he vast majority of the parties claiming water rights . . . are overlying

30

landowners" with correlative rights. No appropriative rights were allocated because there was no surplus. Under these facts, the judgment is consistent with the water right priorities of all parties. There was no violation of section 850, subdivision (a).

*Physical solution and judgment*

*1. Consistency with phase 1*

Mahan Ranch contends the judgment is inconsistent with the phase 1 stipulation because it disregards the Total Safe Yield and the division of the Basin into two subbasins. We disagree.

In phase 1, the initial estimated Total Safe Yield was set at 36,000 AFY, and "may be increased or decreased based on improved understanding of the groundwater basin, additional monitoring, updated groundwater models, or other new information regarding Basin conditions." Phase 1 allocated 12.31 percent of the Total Safe Yield to the Waterworks Districts and reserved the remaining 87.69 percent to be allocated in phase 2. Generally, a safe yield is "usually determined over an extended period of time" as is "representative of long-term hydrologic conditions in the basin." (See *San Fernando*, 14 Cal.3d at p. 214 [safe yield is "in essence, the maximum amount of water that could be extracted annually, year after year, without eventually depleting the underground basin"].) In phase 2, the settlement used an "operating yield" as the basis for the allocations. The settlement defined operating yield as "the cumulative amount of Groundwater that may be sustainably pumped from the Basin for Use in any particular year, excluding the Use of any Groundwater pursuant to a right of Carryover."[8] "In its simplest

---

[8] Carryover is defined as "[a]ny portion of a Water Right Holder's Annual Allocation not Used in the Water Year in which

31

form, operating yield is the estimated safe yield for a given year, considering hydrologic conditions for that year." The operating yield may be adjusted from year to year.

To the extent Mahan Ranch contends the use of an operating yield in the physical solution disregards the Total Safe Yield in phase 1, we conclude there was no error. Other groundwater adjudications have used an operating yield in allocating water. (See *California American Water v. City of Seaside* (2010) 183 Cal.App.4th 471, 481.) Moreover, the use of an operating yield allows for a "dynamic" allocation schedule that can be "adjust[ed] upward and downward along with water supply." The settling parties presented substantial evidence, including an expert's report, to show that this approach maximizes the beneficial use of water. A physical solution is an equitable remedy, and the court has wide discretion to adopt a solution that furthers the goal of preventing waste and maximizing the beneficial use of water. We conclude there was no abuse of discretion in adopting an allocation schedule based on an operating yield. (*Id.* at pp. 480–481.)

We also reject Mahan Ranch's contention that the judgment's single-basin allocation plan is inconsistent with phase 1's two-subbasin management approach. Phase 1 did not mandate that water needed to be allocated separately between the east and west subbasin. In phase 1, the stipulation only apportioned the Waterworks Districts' allocation between the east and west subbasins because Waterworks District No. 19 could extract from both subbasins. Nothing in phase 1 required

---

it is allowed, which may be accrued and Used in future Water Years."

that the Basin and the remaining allocations be divided into two separate east/west subbasins.

Nor do we agree that a two-subbasin approach should have been adopted here. The Department considers the Basin as a single basin in Bulletin 118. The Legislature provided that the court must adjudicate rights in the Basin in accordance with Bulletin 118. (§§ 832, 841, subd. (a); Wat. Code, § 10721.) And substantial evidence, including expert reports and testimony, supports that a single-basin structure would promote "maximum beneficial use" of water and "avoid unfair impacts to landowners based on the location of their property." It would also reflect the practical realities, as the east/west boundaries are uncertain due to the unestablished location of the Somis fault.

Moreover, other parties, including the Zone Mutual Water Company, have delivered water across the east/west management areas without ill effects. Other parties have a similar capacity to transfer water between the two management areas. The trial court did not abuse its discretion in adopting a single-basin allocation structure.

*2. Farming allocations and variances*

Mahan Ranch and Del Norte challenge the judgment's agricultural base allocations and variances contending they "permit waste and hoarding of water."

The judgment grants all farmers a minimum base allocation of 1.3 acre-feet per irrigated acre. In addition to a base allocation, the judgment provides higher water users with a supplemental allocation consisting of two inputs: historical pumping average and a variance to account for equities that require an adjustment. The supplemental allocation provides higher users with more water, but if there is a reduction in water

33

supply, the supplemental allocation is reduced first before the base allocation is reduced. These agricultural allocations were a product of negotiations resulting in the phase 2 settlement and based in part on data from the Master Disclosure Record.

Neither Del Norte nor Mahan Ranch demonstrate that the agricultural allocation was unreasonable. Substantial evidence, including testimony from farmers, an expert, and Mahan Ranch's own previous admissions, supports the trial court's findings that the base allocation represents reasonable current demand, protects lower users from ramp down if supply is decreased, and prevents hardship on lower users by providing flexibility.

Nor are we convinced that affording farmers variances to account for unique circumstances in farming (e.g., immature crops during a historical period, fire damage, well failure) was unreasonable or results in a waste of water. The evidence supports that variances are based on reasonable need. The opportunity for farmers to obtain a variance existed under Fox Canyon's ordinances, and objecting parties themselves have supported, requested, and obtained their own variances. We also reject Mahan Ranch's objection to certain variances because, as the trial court concluded, "they failed to prove that any variance . . . was factually unsupported or inequitable."

Mahan Ranch also contends the judgment disparately treats users with equal priority rights because agricultural users with base allocations do not have to proportionally reduce their water use if water supply is reduced. Instead, supplemental allocation users and nonagricultural users must bear the reduction of water supply before base allocations are reduced. We are not persuaded. In our view, all parties are treated equitably. As the trial court observed, lower users with only base

34

allocations "do not get the benefit of a higher initial allocation but are allocated less risk of reduction to help preserve their ability to use their land productively." The settling parties, who represented more than 50 percent of all groundwater extractors in the Basin and are responsible for over 75 percent of extractions, agreed to the farming allocation structure, and Mahan Ranch did not prove, by a preponderance of evidence, a violation of section 850, subdivision (a). (§ 850, subd. (d).)

In settling, many parties compromised and agreed to scale back their water use or, in some instances, agreed to give some parties a greater allocation than their historical allocation. Section 830, subdivision (b)(3) promotes such compromise. We conclude there was no discrimination between equal priority rights holders and no error in adopting the stipulated allocation schedule.

### 3. *Allocations to Grimes Rock, Hypericum, and Butler Ranch*

Del Norte and Mahan Ranch contend that allocations to Grimes Rock, Inc., Hypericum Land Company, LLC, and Butler Ranch Mutual Water Company were impermissible because they transfer water outside the Basin's boundaries.[9] Mahan Ranch and Solano Verde further contend the allocations to Hypericum and Butler Ranch were based on speculative future need. Neither argument has merit.

Grimes Rock, Hypericum, and Butler Ranch established they had overlying rights to groundwater because they applied

---

[9] To the extent Del Norte argues Mesa Union School District was allocated an appropriative right to water, the argument is forfeited because it was not raised at trial. In any event, Mesa Union was granted an allocation as an overlying landowner, and not as an appropriator.

35

water within the Basin's watershed.  This evidence is undisputed. "An overlying right . . . is the owner's right to take water from the ground underneath for use on his land within the basin *or watershed*; it is based on the ownership of the land and is appurtenant thereto."  (*Mojave, supra*, 23 Cal.4th at p. 1240, italics added; see also *Rancho Santa Margarita v. Vail* (1938) 11 Cal.2d 501, 528 [contiguous land within watershed holds riparian rights].)

To the extent Del Norte argues the trial court lacked jurisdiction to determine these overlying rights because their land is outside the Basin boundary as defined in phase 1, Del Norte is incorrect.  We do not read sections 831.5, 832, or 841 as limiting the court's jurisdiction to determine water rights to the Basin's boundaries set forth in Bulletin 118.  Section 841, subdivision (b) permits a trial court to "revise the boundaries" of a basin and subdivision (c) allows the court to direct a party to a comprehensive adjudication to submit a boundary modification request to the Department.  The trial court here acknowledged the judgment requires the watermaster to consider whether to request an administrative basin boundary modification under section 841.  Since a trial court may revise or request modifications to the contours of the boundaries of a basin, it follows that a court's jurisdiction would not be limited to only land within the existing boundaries.

We also conclude the allocations for Hypericum Land and Butler Ranch were not speculative.  These parties were granted conditional domestic allocations related to a residential project currently in development.  Conditions include that water is used promptly and allocations are not carried over from year to year. There is nothing unreasonable or unfair about these allocations,

36

as there was proof that a project was already underway and there were "concrete plans" for water use. Del Norte and Solano Verde fail to demonstrate how these allocations or any other allocations were unfair or unreasonable.

### 4. *Necessity of the physical solution*

Section 849, subdivision (a) provides that the "court shall have the authority and the duty to impose a physical solution on the parties in a comprehensive adjudication where necessary and consistent with [Article X of Section 2] of the California Constitution." Mahan Ranch contends the physical solution was not necessary because Fox Canyon has already been managing the Basin for decades and that "many components of the Judgment duplicate tasks that Fox Canyon already engages in." This contention has no merit.

Here, the plaintiffs initiated this action because it contested Fox Canyon's pumping restrictions and sought a resolution to conflicting claims of water rights. The physical solution resolves these conflicts. Furthermore, the adoption of the physical solution was a necessary component of the phase 3 settlement. The settling parties agreed to the "future Basin management under the Physical Solution, which . . . incorporates the GSP as a material component of the Physical Solution and recognizes [Fox Canyon]'s SGMA authority as the Basin GSA and as the special act water agency created to manage and conserve the Basin's Groundwater resources." Thus, the physical solution was necessary to resolve the adjudication. Additionally, the physical solution was necessary for the future management of the Basin, as it "provides a governance structure," allows for "judicial oversight over groundwater planning and management," and sets

37

forth a process to address and resolve future issues in management.

We also reject Mahan Ranch's contention that the stakeholder participation provisions in the physical solution are not necessary. The importance of stakeholder participation was substantiated by credible evidence. As one witness testified, stakeholder participation " 'will both improve decision making and promote stakeholder buy-in.' " Mahan Ranch does not demonstrate the trial court abused its discretion in adopting a physical solution for the Basin.

### 5. *Proposition 218*

The judgment authorizes the watermaster to "set, levy and collect Basin Assessments and fees from" water rights holders for the management of the Basin. Mahan Ranch and Del Norte contend the Basin assessments violate Articles XIII C and XIII D of the California Constitution (Proposition 218). We conclude Proposition 218 is inapplicable.

Proposition 218 places restrictions on taxes, property assessments, and fees or charges imposed by "local governments." (Cal. Const., art. XIII C, § 2; art. XIII D, §§ 1, 2 & 3.) " 'Local government' " is defined as "any county, city, city and county, including a charter city or county, any special district, or any other local or regional governmental entity." (Cal. Const., art. XIII C, § 1, subd. (b).)

We conclude Proposition 218 does not apply because the Basin assessment is not a tax or assessment, fee, or charge imposed by "local governments." The watermaster's sole authority to impose the Basin assessment is as "an agent of the Court," subject to the court's jurisdiction and oversight. The court is the judicial branch of the state and not "local

38

government[].”  (See Cal. Const., article VI, § 1.)  And, Fox Canyon’s duties as watermaster, including the collection of Basin assessments, are distinct from its duties as GSA and GMA.  (Cf. *Water Replenishment Dist. of Southern California v. City of Cerritos* (2012) 202 Cal.App.4th 1063, 1072 [appointment of a water district as watermaster “would be judicially authorized and therefore would not be ultra vires”].)  The judgment recognizes this distinction, noting that the watermaster’s ability to impose Basin assessments, “does not modify or amend [Fox Canyon]’s separate, existing authority to adopt assessments or pursue funding under SGMA and/or deriving from [Fox Canyon]’s enabling legislation.”

Nor do the Basin assessments violate Proposition 218. Article XIII C of the California Constitution excludes charges that are “imposed for a specific benefit conferred or privilege granted directly to the payor that is not provided to those not charged,” “does not exceed the reasonable costs to the local government of conferring the benefit or granting the privilege,” “the amount is no more than necessary to cover the reasonable costs of the governmental activity,” and “the manner in which those costs are allocated to a payor bear a fair or reasonable relationship to the payor’s burdens on, or benefits received from, the governmental activity.”  (Cal. Const., art. XIII C, § 1, subd. (e).)

In our view, the Basin assessments meet these criteria. They fund the administrative management of the Basin, investigations, inspections, compliance with and the enforcement of the judgment, personnel costs, infrastructure maintenance, utilities, general operation and maintenance costs, and costs related to groundwater enhancement or basin optimization

39

projects or actions. They also confer the benefits of a managed Basin to the groundwater user/payors. Nothing reflects the assessments are unreasonable or excessive, and the trial court retains jurisdiction to review any future challenge to their reasonableness. Furthermore, the cost to each payor is fair in relation to the benefits they receive. Each payor is charged a uniform rate per acre-foot of their annual allocation. Thus, "parties with correlative rights will be subject to a Basin Assessment proportionate to their annual allocation of groundwater." The Basin assessments will benefit the Basin as a whole, and in turn "all parties benefit from competent, science-based management of the Basin."

We also conclude article XIII D, which applies to all "assessment[s], fee[s] and charge[s]" related to real property, is not applicable. Basin assessments are not merely " 'imposed . . . upon a parcel or upon a person as an incident of property ownership' within the meaning of article XIII D. ([Cal. Const., a]rt. XIII D, § 2, subd. (e).)." (*City of San Buenaventura v. United Water Conservation Dist.* (2017) 3 Cal.5th 1191, 1202–1203, 1208 [distinguishing property-related fees imposed for the costs of providing a service to the property owner's land versus fees imposed for a public service that is not merely for the benefit of landowners].) They are imposed for the management and conservation of the Basin as a whole, and not merely "imposed on a property owner, in his or her capacity as a property owner, to pay for the costs of providing a service to a parcel of property." (*Id.* at p. 1208.)

### 6. CEQA

The judgment provides that the watermaster "is not a 'public agency' subject to [CEQA]. (Pub. Resources Code,

§ 21063.)  Accordingly, nothing in the Judgment or the Physical Solution, nor in the implementation thereof, nor the Watermaster's planning . . . or decisions in accordance with the authority of the Judgment shall be deemed a 'project' subject to review under the CEQA."  Del Norte contends this ruling is erroneous and CEQA applies.  Del Norte is incorrect.

CEQA does not apply to the court or its agents.  "CEQA applies only to 'discretionary projects proposed to be carried out or approved by *public agencies*.'  (Pub. Resources Code, § 21080, subd. (a), italics added.)" (*Robinson v. Superior Court* (2023) 88 Cal.App.5th 1144, 1162.)  A "public agency" "includes any state agency, board, or commission and any local or regional agency, as defined in these guidelines. *It does not include the courts of the state.*"  (Cal. Code Regs., tit. 14, § 15379, italics added.)  And, where the power to act "is reserved to the courts," the agency charged with implementing the court order is not subject to CEQA.  (*Hillside Memorial Park & Mortuary v. Golden State Water Co.* (2011) 205 Cal.App.4th 534, 550.)  Fox Canyon, in its capacity as watermaster, was charged with implementing the judgment and physical solution under the court's authority.  CEQA does not apply under these circumstances.

*7. Compliance with section 850 and article X, section 2*

Appellants contend the judgment violates section 850, subdivision (a)(3) and article X, section 2 because it treats the nonstipulating parties unfairly and does not allocate water based on current reasonable or beneficial use.  We conclude otherwise because they did not carry their burden to prove they were inequitably treated or that their water rights were substantially violated.  (§ 850, subd. (d).)  Substantial evidence, including numerous lay and expert witness testimonies and the Master

41

Disclosure Record, supports the judgment because it allocated water to correlative overlying rights holders based on their reasonable and beneficial use.

*Other arguments*

*1. Evidentiary issues*

Mahan Ranch raises numerous evidentiary contentions. We review them for abuse of discretion. (*Gordon v. Nissan Motor Co., Ltd.* (2009) 170 Cal.App.4th 1103, 1111.)

First, Mahan Ranch contends the trial court erred in admitting confidential mediation evidence, including the proposed phase 2 settlement and the Master Disclosure Record. We are not persuaded. The court was permitted, if not required under these circumstances, to review the proposed settlement agreement. (§ 850, subd. (d).) A written settlement agreement prepared during mediation is not protected from disclosure if the settling parties sign the agreement and the agreement provides it is admissible or states that it is enforceable or binding. (Evid. Code, § 1123, subds. (a), (b).) Writings prepared during a mediation and "prepared by or on behalf of fewer than all the mediation participants" is not made inadmissible if those participants expressly agree in writing, or orally, to its disclosure and the writing does not disclose anything said or done or any admission made during the mediation. (Evid. Code, § 1122, subd. (a)(2).) The phase 2 settlement and the Master Disclosure Record met these criteria, and Mahan Ranch does not prove otherwise. An objecting party cannot unilaterally prevent disclosure of a stipulated settlement. (*Provost v. Regents of University of California* (2011) 201 Cal.App.4th 1289, 1293, 1305.)

Mahan Ranch also contends the trial court erroneously prevented it from full cross-examination based on mediation

42

privilege. We have reviewed each of the record cites Mahan Ranch provided to demonstrate such purported error. We conclude the trial court did not abuse its discretion on these evidentiary issues nor is prejudice shown. (*Twenty-Nine Palms Enterprises Corp. v. Bardos* (2012) 210 Cal.App.4th 1435, 1449 (*Bardos*).)

Next, Mahan Ranch contends the trial court erred in admitting Robert Grether's testimony regarding the Master Disclosure Record and phase 2 settlement because he was not an expert witness. Again, there was no abuse of discretion. Grether is a farmer in the Basin and was involved in developing the Master Disclosure Record, the allocation schedule, and allocation formula. He had personal knowledge to testify regarding the Master Disclosure Record, and he used "simple math" and publicly court-filed documents to calculate the number of parties supporting the settlement. His testimony was not beyond the scope of a percipient witness. (Evid. Code, § 800; CACI No. 223; see *People v. Williams* (1988) 44 Cal.3d 883, 915 ["Lay opinion testimony is admissible where no particular scientific knowledge is required, or as 'a matter of practical necessity when the matters . . . observed are too complex or too subtle to enable [the witness] accurately to convey them to court or jury in any other manner' "]; *Eger v. May Department Stores* (1953) 120 Cal.App.2d 554, 558–559.)

Similarly, there was no error in allowing stipulating parties to provide their lay opinion as to the settlement, including their views on the allocation schedule. (See *Reed v. United Teachers Los Angeles* (2012) 208 Cal.App.4th 332, 336 [trial court may consider the reaction of class members to a proposed settlement in determining whether the settlement is fair].) Such

43

information was relevant to determine whether the phase 2 settlement comports with section 850, subdivision (a).

Lastly, Mahan Ranch contends it was treated unfairly and provides several examples in its brief (e.g., blanket evidentiary rulings, inconsistent rulings, "expanding" phase 2, discovery "anomalies," disqualification,[10] etc.).  We have reviewed these contentions and conclude the record does not reflect unfair treatment.  Nor does Mahan Ranch demonstrate the trial court abused its discretion or demonstrate it suffered prejudice from these rulings.  (*Bardos*, *supra*, 210 Cal.App.4th at p. 1449.)

### 2.  *Exclusion from the physical solution*

Mahan Ranch requests that if this court upholds the judgment, it and Del Norte be excluded from the physical solution.  We deny this request.

The trial court has "the power to enforce [a physical] solution regardless of whether the parties agree." (*City of Lodi v. East Bay Municipal Utility Dist.* (1936) 7 Cal.2d 316, 341; § 849, subd. (a).)  If "any single water rights holder could bar adoption of a proposed physical solution unless it was exempted from it by asserting its specific unconstrained pumping would have limited impact on the effectiveness of its remaining regulations, *any* proposed physical solution could be exposed to a 'death by a thousand cuts' because each objecting water claimant could likewise claim exemption." (*Antelope I*, *supra*, 59 Cal.App.5th at p. 267.)

---

[10] The order disqualifying Mahan Ranch's counsel was vacated in our previous opinion in *Las Posas Valley Water Rights Coalition v. Mahan Ranch, LLC* (June 3, 2022, B317177) [nonpub. opn.] 2022 WL 189326.

Here, the physical solution set forth the water allocations of all parties, consistent with their water rights priorities. It was a result of a comprehensive settlement reached by the majority of the parties that was litigated during two phases of trial. As the trial court concluded, it would "be unfair to the many other groundwater users in the Basin, who are taking on their fair share of the cost of managing the Basin, to allow these [objecting] parties to free ride on those efforts," and it " 'would be impossible to measure their water circumstances without putting it in the context of the entire Basin.' " We agree the inclusion of the objecting parties is vital to the proper management of the Basin. No exclusion is warranted.

DISPOSITION

The judgment is affirmed. Respondents shall recover their costs on appeal.

<u>CERTIFIED FOR PUBLICATION.</u>

 

 

BALTODANO, J.

 

We concur:

 

YEGAN, Acting P. J.                    CODY, J.

Thomas P. Anderle, Judge

Superior Court County of Santa Barbara

_____

Ferguson Case Orr Paterson, Neal P. Maguire, Wendy C. Lascher, James Q. McDermott, Jessica M. Wan and Shane M. Maguire for Defendants, Cross-defendants and Appellants Mahan Development Corporation et al.

Ellison Schneider Harris & Donlan, Robert E. Donlan, Christopher M. Sanders, Shawnda M. Grady; Wanger Jones Helsley, Robert E. Donlan and Shawnda M. Grady for Defendant, Cross-defendant and Appellant Solano Verde Mutual Water Company.

White Brenner, Barbara A. Brenner, Angela Schrimp de la Vergne and Kerry Fuller for Defendant, Cross-defendant and Appellant Del Norte Water Company.

Hanson Bridgett, Michael J. Van Zandt, Nathan A. Metcalf, Sean G. Herman and Jillian E. Ames for Defendants, Cross-complainants and Respondents Ventura County Waterworks District No. 1 et al.

Stoel Rives, Elizabeth P. Ewens, Michael B. Brown and Heraclio Pimentel for Defendant, Cross-defendant and Respondent Fox Canyon Groundwater Management Agency.

O'Melveny & Myers, Jeffrey L. Fisher, Barton Thompson, Matt Kline, Russell McGlothlin, Anton Metlitsky and Heather Welles for Defendants, Cross-defendants and Respondents Leavens Ranches LLC et al.

Downey Brand, Kevin O'Brien and Brian Hamilton for Plaintiffs, Cross-defendants and Respondents Las Posas Valley Water Rights Coalition et al.

Brownstein Hyatt Farber Schreck and Robert J. Saperstein for Defendants and Respondents Wonderful Citrus LLC et al.

Klein DeNatale Goldner and R. Jeffrey Warren for Defendant and Respondent Zone Mutual Water Company.

Aleshire & Wynder and Keith Lemieux for Defendants and Respondents Berylwood Heights Mutual Water Company et al.

LeBeau Thelen and Robert Kuhs for Defendants and Respondents Broadway Road Moorpark, LLC, et al.

Nossaman and Robert N. Kwong for Defendants and Respondents Samuel and Sylvia Alvarez Family Revocable Trust dated 02/20/1996 et al.

The Ventura Legacy Group and Steven R. Hagemann for Defendants and Respondents Culbert Farms, LLC, et al.

Alston & Bird and Edward J. Casey for Defendants and Respondents Butler Ranch Mutual Water Co. et al.

Barg Coffin Lewis & Trapp and Julia Graeser Mata for Defendants and Respondents Milligan Ranch Partnership, L.P., et al.

Richards, Watson & Gershon and B. Tilden Kim for Defendant and Respondent City of Moorpark.